UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

XINGSHUN WEN,

    *Plaintiff,*

  -against-

TETHER OPERATIONS LIMITED,

    *Defendant.*

Case No. 1:25-cv-03032-RPK-JAM

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### XINGSHUN WEN, Plaintiff Pro Se

## PRELIMINARY STATEMENT

Plaintiff Xingshun Wen, proceeding *pro se*, respectfully submits this memorandum in opposition to Defendant Tether Operations Limited's Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Defendant's motion should be denied in full. In the alternative, Plaintiff requests leave to amend to assert properly framed common law claims.

The facts of this case are concrete and documented. On October 19, 2022, Plaintiff—a New York resident domiciled in Queens, New York—had 345,940 USDT stolen from his cryptocurrency wallet through a phishing attack. Within 48 hours, the New York City Police Department ("NYPD") opened a Grand Larceny investigation and contacted Tether's own designated law enforcement channel to request that the hacker's wallet be frozen. Tether refused, citing a technical impossibility that its own subsequent conduct proves was false. The stolen funds remained traceable for 309 days before being moved. Plaintiff permanently lost $345,940.

Defendant's jurisdictional challenge rests on a flawed premise: that because Tether is incorporated in El Salvador and has no New York office, it cannot be sued here. But personal jurisdiction under N.Y. CPLR § 302(a)(3) does not require a New York office. It requires that a foreign entity commit a tortious act outside New York that causes injury to a New York resident, that the entity should have foreseen those New York consequences, and that it derives substantial revenue from interstate commerce. All three are met. Tether knew it was responding to the NYPD about a New York

victim. Tether is the issuer of the world's largest stablecoin. The injury fell squarely on a New York resident in New York.

Defendant's 12(b)(6) challenge targets the statutory labels in Plaintiff's complaint. Those concerns are addressed below, and Plaintiff requests leave to amend to assert common law claims—fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel—that arise directly from the same documented facts and are not subject to the same deficiencies.

## STATEMENT OF FACTS

The following facts are drawn from the Second Amended Complaint and attached exhibits, which are incorporated by reference. All well-pleaded allegations are assumed true and construed in Plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

**Plaintiff is a New York resident.** At the time of the theft and throughout the relevant period, Plaintiff resided at 78-06 46 Avenue, Apt. 7A, Queens, New York 11373. This address appears in the NYPD complaint report (Compl., Ex. B), in Plaintiff's own correspondence (Compl., Ex. F), and in the case caption. Plaintiff maintained a New York driver's license, filed U.S. tax returns as a resident under the substantial presence test (183+ days), and his family resides in New York. Plaintiff's New York domicile is not in dispute and is established by the record.

**The theft and NYPD investigation.** On October 19, 2022, 345,940 USDT ($345,940 USD) was stolen from Plaintiff's wallet through a phishing attack targeting his private keys. (Compl., Ex. A—Bilic Blockchain Forensic Report.) The NYPD opened Complaint No. 2022-110-009537, classifying the theft as Grand Larceny (Felony), and assigned detectives from the 110th Precinct Detective Squad and the Financial Crimes Task Force. (Compl., Ex. B.)

**Tether's misleading response to NYPD.** On October 21, 2022, NYPD Detective Macdonald emailed *inforequests@tether.to*—Tether's own publicly designated law enforcement contact address—requesting that the relevant accounts be frozen pending investigation. (Compl., Ex. C.) On October 24, 2022, Tether responded to the NYPD, claiming it lacked the "technical ability to transfer funds between deposit addresses unless we control the private keys." (Compl., Ex. D.) This statement was materially misleading: the mechanism requested by NYPD was *blacklisting* (freezing a wallet address at the smart contract level), which does not require controlling private keys—it is a unilateral administrative function of Tether as the USDT smart contract issuer. Tether conflated two entirely different technical operations to avoid assisting law enforcement.

**Tether's refusal was discriminatory and pretextual.** Tether subsequently raised a wholly unrelated business dispute from nearly four years earlier as an additional reason for refusal. NYPD Detective Tringali (Financial Crimes Task Force) followed up on November 3, 2022, providing all required law enforcement information, confirming the stolen funds' legitimate provenance, and formally requesting the freeze of wallet TK84xLNXECPernzZaYW7LrCuWdZCErX3LZ. (Compl., Ex. E.) Tether refused again. By November 8, 2022, Tether had definitively declined—citing both its alleged technical limits and Plaintiff's prior history with a third party. (Compl., Ex. G.)

**Tether has frozen private wallets in materially identical circumstances.** On August 2, 2023, Binance CEO Changpeng Zhao publicly reported that Tether had frozen USDT in a private wallet following a phishing attack at Binance's request—an essentially identical scenario to Plaintiff's.

(Compl., Ex. H.) Tether's own website offers a public "Token Recoveries" form for "Stolen assets (through hacking/phishing)." (Compl., Ex. I.) Tether applied its recovery capabilities to a preferred institutional counterparty and refused them to a verified NYPD-backed individual victim.

**The funds remained available for 309 days.** The stolen USDT remained traceable in the hacker's wallet from October 19, 2022 until August 23, 2023—309 days. (Compl., Ex. J.) Tether had ample opportunity to act and deliberately chose not to.

## ARGUMENT

### I. LEGAL STANDARD

On a Rule 12(b)(2) motion, "the plaintiff bears the burden of establishing that the court has jurisdiction" but need only make a *prima facie* showing, with all pleadings and affidavits construed in the plaintiff's favor. *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012). On a Rule 12(b)(6) motion, all well-pleaded factual allegations are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *Pro se* complaints are held to less stringent standards and must be liberally construed to raise the strongest arguments they suggest. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

### II. THIS COURT HAS PERSONAL JURISDICTION OVER TETHER UNDER N.Y. CPLR § 302(a)(3)

#### A. Defendant's Case Citations Are Distinguishable

Defendant relies heavily on *Twin Beauty LLC v. NR Interactive LLC*, 2024 WL 5108153 (E.D.N.Y. Dec. 14, 2024). That case is fundamentally different from this one in a dispositive way. In *Twin Beauty*, both parties were *businesses*: the issue was whether a Florida/Japan-based **defendant** had sufficient contacts with New York to be haled into court there. The court found the defendant had no New York business activity.

Here, by contrast, Plaintiff is an **individual New York resident** who suffered financial harm in New York. The question under § 302(a)(3) is not whether Tether has New York business operations—it is whether Tether's tortious act outside New York caused injury to a person in New York, with foreseeable New York consequences, by an entity deriving substantial revenue from interstate commerce. *Twin Beauty* does not address § 302(a)(3) and does not apply to this analysis.

Similarly, *Hanover v. One Communications (Guyana) Inc.*, 2025 WL 948116 (E.D.N.Y. Mar. 28, 2025), involved a Guyanese company broadcasting a marketing event over the internet with no targeted conduct toward New York. Tether's situation is materially different: Tether engaged directly and repeatedly with the New York City Police Department, over multiple weeks, knowing the victim was a Queens resident, concerning a New York criminal investigation. That is targeted, knowing engagement with New York—not passive internet broadcasting.

#### B. Specific Jurisdiction Exists Under § 302(a)(3)(ii)

N.Y. CPLR § 302(a)(3)(ii) confers jurisdiction over a non-domiciliary who commits a tortious act outside New York "causing injury to person or property within the state" if the defendant "expects

3

or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." All three elements are satisfied.

**Element 1 — Injury within New York.** Plaintiff is a domiciliary of Queens, New York, as established by the NYPD complaint report, his New York driver's license, his New York tax filings, and his family's New York residence. His financial injury—the permanent loss of $345,940—was suffered in New York. This is not merely incidental economic loss; Tether was specifically informed by NYPD that the victim was a New York resident. *Cf. Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30, 38 (2d Cir. 2010) (noting the injury situs question turns on the facts of each case).

**Element 2 — Foreseeability of New York consequences.** Tether received and responded to multiple emails from the *New York City Police Department*. The NYPD emails were on official NYPD letterhead, from @nypd.org email addresses, identifying the victim's Queens address, and referencing a New York criminal case number. It is impossible for Tether to credibly claim it could not foresee that refusing a verified NYPD request would harm a New York resident in New York. The foreseeability of New York consequences was *explicit* and *documented*, not merely constructive.

**Element 3 — Substantial revenue from interstate or international commerce.** Tether is the issuer of the world's largest stablecoin by market capitalization and daily trading volume. USDT is traded on exchanges accessible throughout the United States, including New York. Tether generates billions of dollars in annual revenue from its global operations. This amply satisfies the "substantial revenue from interstate or international commerce" requirement. *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999).

### C. Tether's Deceptive Communication Was Directed at New York

Defendant argues that its responses to NYPD emails were insufficient contacts with New York. But these were not random emails from a private citizen. Tether received and responded to official communications from a New York governmental entity—the NYPD Financial Crimes Task Force—conducting a felony investigation under New York law, on behalf of a New York resident.

The Second Circuit's "effects test," drawn from *Calder v. Jones*, 465 U.S. 783 (1984), supports jurisdiction where a defendant's intentional act is expressly aimed at the forum and causes harm there. *Penguin Grp.*, 609 F.3d at 35–36. Here, Tether's misleading technical representations were made *to the NYPD*—a New York agency—in response to a New York felony investigation. The "aim" of Tether's communication was New York law enforcement. The resulting harm fell on a New York resident. This is precisely the kind of targeted, knowing conduct that satisfies the effects test.

Furthermore, Tether publicly designates *inforequests@tether.to* as a dedicated portal for law enforcement requests worldwide, including New York. By operating this channel and inviting law enforcement engagement, Tether assumes a degree of purposeful contact with every jurisdiction whose law enforcement uses it—including New York.

### D. Exercise of Jurisdiction Comports with Due Process

Tether operates a global stablecoin that circulates through New York financial markets. It maintains a public law enforcement portal used by NYPD. It advertises Token Recovery services accessible to New York residents. It engaged with New York law enforcement repeatedly over several weeks regarding a New York felony. Exercising jurisdiction over Tether for conduct that caused deliberate harm to a New York resident through knowing engagement with New York law enforcement does not "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

## III. PLAINTIFF'S COMPLAINT STATES VIABLE CLAIMS AND PLAINTIFF REQUESTS LEAVE TO AMEND

### A. The § 349 Claim Is Strengthened by Tether's Deception of a New York Governmental Entity

Defendant relies on *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314 (2002), for the proposition that a § 349 deceptive act must occur "in New York." Plaintiff does not dispute the *Goshen* standard. However, the facts here present a stronger nexus to New York than *Goshen* contemplated.

In *Goshen*, an insurance company's deceptive marketing originated in New York but injured out-of-state consumers—the deception "occurred" at the place of the out-of-state transaction. Here, the situation is *reversed*: Tether's deceptive technical representation was made *in direct response to a New York governmental entity*—the NYPD Financial Crimes Task Force, operating in New York, conducting a New York criminal investigation. The NYPD received Tether's misleading communication in New York, relied on it in New York, and communicated the resulting decision to the New York victim in New York. The "act" of misleading law enforcement had its operative effect within New York, through a New York government channel, affecting a New York criminal proceeding.

Moreover, Tether's public Token Recovery program—advertised on its website to a worldwide public including New York consumers—constitutes ongoing consumer-oriented conduct. When Tether selectively withholds that service from a verified New York theft victim while providing it to preferred institutional counterparties, the discriminatory application of that public-facing service is itself a deceptive practice affecting New York consumers.

### B. Leave to Amend Should Be Granted to Assert Common Law Claims

Leave to amend should be "freely give[n] when justice so requires," Fed. R. Civ. P. 15(a)(2), and is particularly appropriate for *pro se* plaintiffs. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The underlying facts here are strong, documented, and support the following common law claims:

**1. Fraudulent Misrepresentation.** Tether made a materially false statement of fact to NYPD: that it lacked the "technical ability to transfer funds between deposit addresses." This statement was false in a dispositive respect—it conflated two different operations. The request was to *blacklist/freeze* a wallet address (a unilateral administrative function of Tether as USDT smart contract administrator, requiring no private key access) with *transferring funds* (which would require private key access). Tether's own subsequent conduct—publicly acknowledged by Binance

CEO Changpeng Zhao in Exhibit H—confirms that Tether can and does freeze private wallets without private key access. The statement was made to induce NYPD to abandon its recovery effort, and it succeeded. Plaintiff, relying on NYPD's communication of Tether's position, lost the 309-day window to recover the stolen funds, suffering $345,940 in damages. All elements are present: (a) material misrepresentation of fact; (b) knowledge of falsity or reckless disregard; (c) intent to induce reliance; (d) justifiable reliance by NYPD and Plaintiff; (e) resulting damages.

**2. Negligent Misrepresentation.** As the issuer and smart contract administrator of USDT and the operator of a dedicated law enforcement response program, Tether assumed a duty to provide accurate technical information when responding to official law enforcement inquiries. Its statement about its technical capabilities was, at minimum, negligently inaccurate, conflating blacklisting with fund transfer in a way that misled NYPD. This negligent misrepresentation caused Plaintiff's permanent financial loss.

**3. Promissory Estoppel.** Tether's public Token Recovery program constitutes a clear promise of recovery assistance for theft victims. Plaintiff and NYPD reasonably relied on this public commitment in pursuing recovery through Tether's designated channels. Tether's selective refusal—applied against this Plaintiff on the basis of an unrelated prior dispute while serving preferred institutional clients in identical circumstances—caused foreseeable and severe harm.

## IV. TETHER'S TECHNICAL MISREPRESENTATION IS DOCUMENTED AND CENTRAL

Defendant states in its brief that Tether "made accurate statements to law enforcement." (Def. Mem. at 1, 3.) This assertion is contradicted by the record and reflects the central factual dispute in this case.

The critical distinction is between two entirely different technical operations:

- Blacklisting/Freezing: Tether, as the administrator of the USDT smart contract on the TRON blockchain, can unilaterally add any wallet address to a blacklist. This prevents outgoing transactions from that address. It requires no access to the wallet's private keys. It is a function of Tether's privileged role as smart contract issuer—not a function of controlling any individual wallet.

- Transferring funds: Moving USDT from one address to another does require the private key of the sending address. Tether accurately stated it cannot do this for wallets it does not control.

NYPD never asked Tether to *transfer* funds. NYPD asked Tether to *freeze* (blacklist) the hacker's wallet. Tether's response addressed the wrong operation, either deliberately or negligently, and in doing so provided a technically misleading answer that caused NYPD to conclude Tether was unable to help.

That Tether *can* freeze private wallets—without private keys—is established by Exhibit H: Changpeng Zhao publicly confirmed that Tether froze a private wallet following a similar phishing attack at Binance's request. The only difference between that case and Plaintiff's is the identity of the requester: a major institutional client versus an NYPD-backed individual victim. This selective application of Tether's technical capabilities is exactly the discriminatory and deceptive conduct Plaintiff alleges.

6

Furthermore, Tether's invocation of an unrelated four-year-old business dispute as a secondary reason for refusal confirms that its technical justification was at least partially pretextual. A company acting in good faith does not cite a victim's prior relationship history when responding to a police freeze request.

## V. PLAINTIFF'S CLAIMS ARE TIMELY

Defendant argues that a CEA market manipulation claim would be time-barred. Plaintiff acknowledges that 18 U.S.C. § 4, the FTC Act, and the CEA do not provide private rights of action and does not oppose dismissal of those specific statutory claims. However, the common law claims Plaintiff seeks to assert are timely. Fraudulent misrepresentation is subject to New York's six-year limitations period (N.Y. CPLR § 213(8)); negligent misrepresentation and promissory estoppel are subject to a three-year period. The conduct occurred in October–November 2022. Plaintiff filed suit on May 9, 2025—well within all applicable periods. The § 349 claim carries a three-year limitations period and is equally timely.

## VI. DISMISSAL WITH PREJUDICE WOULD BE INAPPROPRIATE

The Second Circuit has held that a *pro se* complaint should not be dismissed with prejudice without leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999). The factual record here is extensive and well-documented: police reports, certified forensic blockchain analysis, authenticated email correspondence with NYPD, public evidence of Tether's selective enforcement, and Tether's own support portal confirming the existence of Token Recovery services. An amended complaint asserting properly framed common law claims would not be futile. Dismissal with prejudice is unwarranted.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court:

1. Deny Defendant's Motion to Dismiss in its entirety;

2. In the alternative, grant Plaintiff leave to file an amended complaint asserting claims for fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel under New York common law, and reconsidering the § 349 claim in light of the arguments above;

3. Deny Defendant's request for dismissal with prejudice; and

4. Grant such other and further relief as the Court deems just and proper.

Plaintiff further notes that, in light of the documented evidence of Tether's selective enforcement, discriminatory bad faith, and deliberate misrepresentation to New York law enforcement, this matter may be amenable to resolution through a Court-supervised settlement conference, which Plaintiff would welcome at the Court's discretion.

Respectfully submitted,


Xingshun Wen

Plaintiff, Pro Se

4838 Glenwood St.,

Queens, New York 11373

ansen.wen@msn.com

929-333-5158

Dated: _____, 2026